UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| LESLIE FIRCHAU,<br>Plaintiff,<br>v.<br>MICHAEL J. ASTRUE, Commissioner of Social Security Administration,<br>Defendant. | Case No. C06-1849-TSZ-JPD<br><br>REPORT AND RECOMMENDATION |

Plaintiff Leslie Firchau appeals the final decision of the Commissioner of the Social Security Administration ("Commissioner") which partially denied her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-33 and 1381-83f, after a hearing before an administrative law judge ("ALJ"). For the reasons set forth below, the Court recommends that the Commissioner's decision be REVERSED and REMANDED for further proceedings not inconsistent with the Court's instructions.

## I. FACTS AND PROCEDURAL HISTORY

Plaintiff is a forty-five year-old married woman with two years of college education. Administrative Record ("AR") at 65, 93. She has previously worked as a receptionist and fitness specialist. AR at 111. Plaintiff was last gainfully employed in October 2002. AR at 87-88.

On June 23, 2003, plaintiff applied for SSI and DIB based on mental and physical impairments, alleging an onset date of October 15, 2000. AR at 65-67, 347-49. Plaintiff asserts that depression, anxiety, post-traumatic stress disorder, chronic fatigue syndrome, and fibromyalgia have kept her from maintaining employment of any kind. AR at 65-67, 87, 347-49; Dkt. No. 10 at 8-13. Her date last insured was June 30, 2003. AR at 71-72.

The Commissioner denied plaintiff's claim initially and on reconsideration. AR at 35-42, 350-59. Plaintiff requested a hearing before an ALJ, which took place on November 28, 2005. AR at 380-415. On April 6, 2006, the ALJ issued a partially favorable decision, finding that plaintiff was not disabled at step five from October 15, 2000 (her onset date) through February 13, 2005, but *was* disabled at step five from February 14, 2005 through April 6, 2006. AR at 30-32. Because plaintiff's insured status expired on June 30, 2003, the ALJ determined that she was entitled to SSI, but not DIB. AR at 19, 29-30.[1] Plaintiff's administrative appeal of the ALJ's decision was denied by the Appeals Council, AR at 6-8, making the ALJ's ruling the "final decision" of the Commissioner as that term is defined by 42 U.S.C. § 405(g). On December 29, 2006, plaintiff timely filed the present action challenging the Commissioner's decision. Dkt. No. 1.

## II. JURISDICTION

Jurisdiction to review the Commissioner's decision exists pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## III. STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court may set aside the Commissioner's denial of social security benefits when the ALJ's findings are based on legal error or not supported by substantial evidence in the record as a whole. *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 (9th

---

[1] To be entitled to DIB under Title II of the Social Security Act, a claimant must show that she was disabled on or before the period of time she was last insured. *Tidwell v. Apfel,* 161 F.3d 599, 601 (9th Cir. 1998); *Flaten v. Secretary of Health and Human Servs.*, 44 F.3d 1453, 1461-62 (9th Cir. 1995) (collecting cases). There is no such requirement for SSI claims.

Cir. 2005). "Substantial evidence" is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 201 (1971); *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving any other ambiguities that might exist. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). While the Court is required to examine the record as a whole, it may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002). When the evidence is susceptible to more than one rational interpretation, it is the Commissioner's conclusion that must be upheld. *Id.*

## IV. EVALUATING DISABILITY

As the claimant, Ms. Firchau bears the burden of proving that she is disabled within the meaning of the Social Security Act (the "Act"). *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999) (internal citations omitted). The Act defines disability as the "inability to engage in any substantial gainful activity" due to a physical or mental impairment which has lasted, or is expected to last, for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is disabled under the Act only if her impairments are of such severity that she is unable to do her previous work, and cannot, considering her age, education, and work experience, engage in any other substantial gainful activity existing in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); *see also Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

The Commissioner has established a five step sequential evaluation process for determining whether a claimant is disabled within the meaning of the Act. *See* 20 C.F.R. §§ 404.1520, 416.920. The claimant bears the burden of proof during steps one through four. At step five, the burden shifts to the Commissioner. *Id.* If a claimant is found to be disabled at any step in the sequence, the inquiry ends without the need to consider subsequent steps.

Step one asks whether the claimant is presently engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b).[2] If she is, disability benefits are denied. If she is not, the Commissioner proceeds to step two. At step two, the claimant must establish that she has one or more medically severe impairments, or combination of impairments, that limit her physical or mental ability to do basic work activities. If the claimant does not have such impairments, she is not disabled. 20 C.F.R. §§ 404.1520(c), 416.920(c). If the claimant does have a severe impairment, the Commissioner moves to step three to determine whether the impairment meets or equals any of the listed impairments described in the regulations. 20 C.F.R. §§ 404.1520(d), 416.920(d). A claimant whose impairment meets or equals one of the listings for the required twelve-month duration requirement is disabled. *Id.*

When the claimant's impairment neither meets nor equals one of the impairments listed in the regulations, the Commissioner must proceed to step four and evaluate the claimant's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e). Here, the Commissioner evaluates the physical and mental demands of the claimant's past relevant work to determine whether she can still perform that work. 20 C.F.R. §§ 404.1520(f), 416.920(f). If the claimant is able to perform her past relevant work, she is not disabled; if the opposite is true, then the burden shifts to the Commissioner at step five to show that the claimant can perform other work that exists in significant numbers in the national economy, taking into consideration the claimant's RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(g), 416.920(g); *Tackett*, 180 F.3d at 1099, 1100. If the Commissioner finds the claimant is unable to perform other work, then the claimant is found disabled and benefits may be awarded.

---

[2] Substantial gainful activity is work activity that is both substantial, i.e., involves significant physical and/or mental activities, and gainful, i.e., performed for profit. 20 C.F.R. § 404.1572.

## V. DECISION BELOW

On April 6, 2006, the ALJ issued a decision finding:

1. The claimant last met the insured status requirements of the Social Security Act through June 30, 2003.

2. The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 CFR 404.1520 (b), 404.1571 et seq., 416.920(b) and 416.971 et seq.).

3. Since the alleged onset date of disability, the claimant has had the following severe impairments: affective disorder not otherwise specified, anxiety disorder not otherwise specified, and tendonitis (20 CFR 404.1520(c) and 416.920(c)).

4. Since the alleged onset date of disability, the claimant has not had an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d) and 416.920(d)).

5. After careful consideration of the entire record, the undersigned finds that, prior to February 14, 2005, the claimant had the residual functional capacity to occasionally lift and carry 20 pounds, frequently lift and carry ten pounds, stand and/or walk for six hours in an eight hour day, sit for six hours in an eight hour day, and do unlimited pushing and pulling. She could not climb ladders, ropes, or scaffolds. She needed to avoid concentrated exposure to temperature extremes and needed to avoid heights and hazards. She could not work with the public and could do simple and repetitive tasks.

6. After careful consideration of the entire record, the undersigned finds that, beginning on February 14, 2005, the claimant has had the residual functional capacity to occasionally lift and carry 20 pounds, frequently lift and carry ten pounds, stand and/or sit for six hours in an eight hour day, sit for six hours in an eight hour day, and do unlimited pushing and pulling. She cannot climb ladders, ropes, or scaffolds. She needs to avoid concentrated exposure to temperature extremes and needed to avoid heights. She cannot work with the public and can do simple, routine tasks but cannot sustain concentration for more than two hours at a time. She cannot sustain regular work (SSR 96-8p).

7. Since the alleged onset date of disability, the claimant has been unable to perform past relevant work (20 CFR 404.1565 and 416.965).

8. The claimant was born on July 9, 1962 and was thirty-eight years old on the alleged disability onset date, which is defined as a younger individual age 18-44 (20 CFR 404.1563 and 416.963).

9. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

10. Due to the claimant's age, transferability of job skills is not material to the determination of disability prior to February 14, 2005. Beginning on that date, the claimant has not been able to transfer any job skills to other occupations

(20 CFR 404.1568 and 416.968).

11. Prior to February 14, 2005, considering the claimant's age, education, work experience, and residual functional capacity, there were a significant number of jobs in the national economy that the claimant could have performed (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

12. Beginning on February 14, 2005, considering the claimant's age, education, work experience, and residual functional capacity, there are not a significant number of jobs in the national economy that the claimant could perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

13. The claimant was not disabled prior to February 14, 2005, but became disabled on that date and has continued to be disabled through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

14. The claimant was not under a disability within the meaning of the Social Security Act at any time through June 30, 2003, the date last insured (20 CFR 404.315(a) and 404.320(b)).

AR at 19-20, 28-30.

## VI. ISSUES ON APPEAL

The principal issue in this case is whether the ALJ erred in finding an onset date of February 14, 2005—the day after the plaintiff was made aware of her brother's suicide. AR at 398. As noted above, the plaintiff believes the onset of her disability occurred on October 15, 2000. After the ALJ issued his decision, the plaintiff submitted a declaration from her treating psychiatrist which explained certain notes and opined further about plaintiff's condition. AR at 369-75. This information was submitted to the Appeals Council, which nevertheless denied the appeal and affirmed the ALJ without substantive comment. AR at 6-8. With this background in mind, the plaintiff presents the following issues for review:

1. Did the ALJ Fail to Provide Legally Sufficient Reasons for Rejecting the Medical Opinion Evidence of Treating Psychiatrist Dr. Fink with Respect to the Period Prior to February 14, 2005?

2. Did the ALJ Err in Assessing the Plaintiff's Credibility?

3. What Is the Effect of the Post-Hearing Medical Evidence from Dr. Fink?

## VII. DISCUSSION

### A. The Additional Evidence Submitted to Appeals Council Does Not Alter the Posture of this Case

A hotly-debated aspect of this case is the impact of Dr. Fink's July 2006 declaration to plaintiff's attorney, which was submitted to the Appeals Council for review. AR at 9, 369-75. It is clear that the Appeals Council did not believe that this evidence warranted a remand to the ALJ, and the plaintiff has not asked the Court to undertake a substantive review of this conclusion. *See* Dkt. No. 14 at 4.

In his declaration, Dr. Fink reiterates his conclusion that plaintiff is unable to work, takes issue with the ALJ's interpretation of certain of his opinions and treatment notes, and underscores the fact that plaintiff quit seeing Dr. Fink from May 2004 to September 2005 because her insurance would not cover these visits. AR at 370-75. The plaintiff argues that this evidence requires a reversal. Dkt No. 10 at 11. The defendant insists that it holds no persuasive value. Dkt. No. 13 at 18. The Court's conclusion falls somewhere between these two extremes.

The Ninth Circuit has long held that after the ALJ has rendered an opinion, treating physician opinions that are solicited by claimant's counsel for litigation purposes may be rejected as less persuasive. *See, e.g., Saelee v. Chater*, 94 F.3d 520, 522-23 (9th Cir. 1996); *Macri v. Chater*, 93 F.3d 540, 544 (9th Cir. 1996); *cf. Johnson v. Callahan*, 975 F. Supp. 1366, 1371 (D. Or. 1997) ("Medical reports issued after the Commissioner's decision . . . are deemed less persuasive than those issued prior to the decision."). The Court recognizes the risk attendant to this situation. Were such evidence sufficient to automatically warrant a reversal, no social security appeal would proceed without claimant's counsel first obtaining this surefire declaration. Nevertheless, the evidence in this case, coming from one of plaintiff's long-time treating physicians with expertise in his field, is not devoid of all probative value. Although the Appeals Council affirmed the decision of the ALJ, this evidence is part of the

record on review to this Court. *See Gomez v. Chater*, 74 F.3d 967, 971 (9th Cir. 1996); *Ramirez v. Shalala*, 8 F.3d 1449, 1452 (9th Cir. 1993). Accordingly, while Dr. Fink's July 2006 declaration may support plaintiff's argument that the ALJ improperly assessed the opinions of Dr. Fink that were before him,[3] it does not automatically mandate a remand or otherwise drastically alter the posture of this case.

B. The ALJ Erred in His Evaluation of the Medical Evidence

Although the plaintiff initially asserted impairments of chronic fatigue syndrome and fibromyalgia, the present appeal is restricted to issues involving the evaluation of her mental impairments. The ALJ reviewed mental impairment evidence submitted by plaintiff's primary care treating physician Dr. Kevin Clay (AR at 184-245, 281-316, AR at 341-46 (declaration dated 11/23/05); treating psychiatrist Dr. Robert Fink (AR at 246-66 (for period 8/27/02-6/11/04), AR at 317-340 (medical source statement and psychiatric review technique form ("PRTF") dated 9/29/05)); counselor Darleen Kidlow (AR at 267-72); and Dr. Charles Regets, who completed an RFC Assessment and PRTF on November 14, 2003, which was and reviewed and affirmed by nontreating state agency psychologist Dr. Janis Lewis on February 14, 2004. AR at 166-83.

The plaintiff assigns error only to the ALJ's treatment of Dr. Fink's medical evidence. Dkt. No. 10 at 7-17. Although her opening brief makes a passing reference to Dr. Clay, see Dkt. No. 10 at 17, the plaintiff does not assert that the ALJ erred with respect to his assessment of Dr. Clay's opinions.

1. *Standards for Evaluating Medical Opinion Evidence*

As a matter of law, more weight is given to a treating physician's opinion than to that of a nontreating physician because a treating physician "is employed to cure and has a greater opportunity to know and observe the patient as an individual." *Magallanes*, 881 F.2d at 751;

---

[3] The Court uses the term "may" here because it concludes that this case would be remanded for further proceedings regardless of the information contained in Dr. Fink's 2006 declaration.

*see also Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007). "Likewise, greater weight is accorded to the opinion of an examining physician than a non-examining physician." *Andrews*, 53 F.3d at 1041; *see also* 20 C.F.R. § 416.927(d)(1).

A treating physician's opinion, however, is not necessarily conclusive as to either a physical condition or the ultimate issue of disability, and can be rejected, whether or not that opinion is contradicted. *Magallanes*, 881 F.2d at 751. If an ALJ rejects the opinion of a treating or examining physician, the ALJ must give clear and convincing reasons for doing so if the opinion is not contradicted by other evidence, and specific and legitimate reasons if it is. *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998). "This can be done by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Id.* (citing *Magallanes*, 881 F.2d at 751). The ALJ must do more than merely state his conclusions. "He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id*. (citing *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988)). Such conclusions must at all times be supported by substantial evidence. *Reddick*, 157 F.3d at 725.

The plaintiff argues that the ALJ rejected the opinions of Dr. Fink without a "clear and convincing" or "specific and legitimate" basis. Dkt. No. 10 at 10-17. The Commissioner disagrees, insists that Dr. Finks medical conclusions are controverted, and argues that the ALJ's reasons for rejecting them were specifically outlined and sufficiently legitimate. Dkt. No. 13 at 13-18.

2. *Dr. Fink*

The plaintiff claims that the ALJ did not properly evaluate the opinions of treating physician Fink and that the ALJ's reasoning is inconsistent, because he found the plaintiff to be disabled as early as February 14, 2005, but not before that, even though earlier medical reports led the ALJ to conclude that the plaintiff showed a period of improvement.

The plaintiff first saw Dr. Fink in August 2002. AR at 261-66.[4] Dr. Fink diagnosed major depression, generalized anxiety disorder, a history of obsessive-compulsive disorder, mild panic disorder, and post-traumatic stress disorder. AR at 266. He assessed her current Global Assessment of Functioning at 40. *Id.*[5] He increased her medication. *Id.*

In September 2002, Dr. Fink changed plaintiff's medication, and in October 2002, plaintiff reported a "little better mood," but Dr. Fink ultimately concluded that plaintiff had increased anxiety and decreased mood. AR at 260. On November 26, 2002, plaintiff informed Dr. Fink that she had been laid off, was feeling much stress, but was trying to "hang[] in there," and Dr. Fink conclusions mirrored that of the previous month. *Id.* Dr. Fink increased her medication dose. *Id.*

Dr. Fink saw plaintiff for treatment almost monthly from January 2003 to November 2003. In January 2003, plaintiff stated that the new medication "seem[ed] tp help me get going," that her anxiety was still very high, and that she was looking for work. AR at 259. She had been dating someone, and Dr. Fink assessed that the plaintiff's major depression was better. AR at 259. In February 2003, Dr. Fink noted the plaintiff could not find work and that her anxiety increased with stress related to family problems; he diagnosed major depression and generalized anxiety disorder. *Id.* In April 2003, plaintiff told Dr. Fink that she and her sister were trying to find an investor for land they owned in Glacier National Park, and that

---

[4] It appears that this date might actually have been February 2002, see AR at 253, but no written materials from that meeting are included in the administrative record.

[5] The GAF is a subjective determination based on a scale of 1 to 100 of "the clinician's judgment of the individual's overall level of functioning." AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (Text. Rev., 4th ed. 2000). A GAF score of 51-60 indicates "moderate symptoms," such as a flat affect, occasional panic attacks, or "moderate difficulty in social or occupational functioning." *Id.* at 34. A GAF score of 41-50 indicates "[s]erious symptoms [or] serious impairment in social, occupational, or school functioning," such as the lack of friends and/or the inability to keep a job. *Id.* A GAF score of 31-40 indicates "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id.* at 34

she was "alright" and her mood was better, although Dr. Fink concluded that plaintiff exhibited "chronic worry[ing] and anxiety" over her family situation, including the land ownership. AR at 258. In June and July 2003, plaintiff exhibited increased depression, hysteria, and paranoia related to her mother and brother's deaths, and expressed concerns regarding the fact that she had turned in her sister's drug dealer. AR at 256-57. Dr. Fink started prescribed Risperdal, an anti-psychotic. AR at 256.

In October 2003, Dr. Fink performed a psychiatric examination and prepared a report for submission to DSHS. AR at 249-53. He diagnosed plaintiff with a mixed anxiety state and symptoms of generalized anxiety, a panic disorder, post-traumatic stress disorder, and major depression, recurrent. AR at 253. He also concluded that her prognosis was poor, that she was "unable to tolerate stress whatsoever," that she was "totally disabled," and that she was "one of the sickest people I see and is essentially unable to function in any kind of social or occupational setting." AR at 253.

Dr. Fink met with the plaintiff again on November 11, 2003, and diagnosed major depression, generalized anxiety disorder, and chronic fatigue. AR at 248. On June 11, 2004, Dr. Fink wrote a letter "to whom it may concern," outlining the same diagnoses as set forth in his October 2003 report, reiterating plaintiff's poor prognosis, "worsening over time," and the conclusion that she was "totally disabled." AR at 247.

There are no treatment notes from November 12, 2003 through the June 11, 2004 letter. In fact, plaintiff did not see Dr. Fink again until September 29, 2005, at which time Dr. Fink specifically noted that the plaintiff had not seen him for sixteen months. AR at 335. Dr. Fink made five pages of hand-written notes about plaintiff's September 29, 2005 examination, see AR at 335-39, upon the conclusion of which he completed a medical source statement and PRTF. AR at 317-30, 331-32. In the medical source statement, Dr. Fink opined that the plaintiff had marked or extreme limitations in all areas of functioning. He also specifically stated that the support for his conclusions was his September 29, 2005 mental status

examination and the "3+ yrs. [h]istory of seeing this patient." AR at 331-32. The PRTF, though more detailed, contained the same conclusions. Dr. Fink concluded that plaintiff had marked limitations in activities of daily living, marked limitations in social functioning, marked limitations in maintaining concentration, persistence, or pace, and found four or more episodes of decompensation. AR at 327. On July 26, 2006, Dr. Fink completed a written question-and-answer declaration that explained certain of his diagnoses, findings, and notes, and opined further about plaintiff's condition. AR at 369-75.

4. *Analysis of the ALJ's Treatment of the Medical Opinion Evidence*

The ALJ assigned little or no weight to the medical opinions of Dr. Fink. He gave some weight to Dr. Fink's October 20, 2003 report as of the date of that consultive examination, but little weight prior to the examination. He gave weight to the report as of the consultive examination because treatment notes after that date indicated the plaintiff had increased problems. AR at 24. The ALJ also interpreted plaintiff's attempts to locate an investor for the Glacier property as "work," see AR at 22, and noted that Dr. Fink failed to mention in his formal reports many of the daily activities engaged in by the plaintiff which, according to the ALJ, included showering, cleaning, shopping, cooking, driving her son to and from school, helping her son with homework, watching some of his soccer games, participating in church activities, and even working part time. AR at 23-24. The ALJ concluded, simultaneously, that Dr. Fink failed to mention many of the activities the claimant reported to him, but also relied significantly on plaintiff's subjective reporting of her symptoms and activities. *Id*. at 24. Ultimately, the ALJ concluded that the balance of Dr. Fink's notes would support a claim of affective disorder and anxiety but would not support a claim of post-traumatic stress disorder or bipolar disorder. *Id.*

Dr. Fink's June 11, 2004 letter was also given little weight. According to the ALJ, it simply repeated verbatim the statement in the October 2003 report, whereas the file showed that plaintiff's treatment was effective and she was "clearly recovering by at least August

2004," having "managed to meet a boyfriend, establish a relationship, and get married in January 2005." AR at 24-25. The ALJ also rejected Dr. Fink's September 29, 2005 opinions because they were "based on a single session with claimant," and amounted to "speculation" as to the June 2004 through September 2005 time period, due to the sixteen-month gap in treatment. AR at 26. The ALJ also determined that the record did not support plaintiff's explanation that this gap in treatment was due to her inability to afford treatment, pointing out that "she was able to continue to see Dr. Clay throughout 2004 and apparently got new insurance when she remarried in 2005." AR at 27.

For the following reasons, the Court finds that it was reversible error for the ALJ to reject Dr. Fink's medical opinions on many of the above-stated bases.

First, it was error for the ALJ to reject Dr. Fink's September 2005 report based on the interpretation that it was based on solely a single exam. Nothing in the record supports this conclusion. In fact, the only evidence of record suggests that the opposite is true: Dr. Fink's September 2005 report specifically noted, twice, that his opinions were based on his September 29, 2005 mental status exam *and* his three-plus year history of treating the plaintiff. *See* AR at 331, 332. This history included no less than twelve examinations in August 2002, October 2002, November 2002, January 2003, February 2003, April 2003, June 2003, July 2003, September 2003, October 2003, November 2003, and June 2004.[6] While the medical evidence regarding this issue might be susceptible to more than one rational interpretation, *Thomas*, 278 F.3d at 954, the ALJ's interpretation cannot be included within that group.

Second, and for similar reasons, it was error for the ALJ to reject Dr. Fink's September 2005 report as mere "speculation" for the period of time in question in this case.

---

[6] Although Dr. Fink undoubtedly relied on plaintiff's self-reporting of her symptoms, he also conducted mental status examinations on numerous occasions surrounding the sixteen week absence of treatment. Plaintiff's self-reports appear to be, for the most part, consistent with her diagnoses. Additionally, Dr. Fink had treated and examined the plaintiff on several prior occasions and it is reasonable to assume, even without his explicit clarification (AR at 331-32), that he also relied on these previous assessments in rendering his September 2005 opinion.

Dr. Fink is a specialist in his field, and was plaintiff's treating psychiatrist for over three years. *Smolen*, 80 F.3d at 1285 ("[T]he opinions of a specialist about medical issues related to his or her area of specialization are given more weight than the opinions of a nonspecialist.") (citing 20 C.F.R. § 404.1527(d)(5)). The record simply does not support the ALJ's conclusion in this regard. Nor does the record reflect that the retrospective conclusions drawn by Dr. Fink were an aberration. Furthermore, his September 29, 2005 report contains several handwritten notes that were consistent with several pages of his notes taken over the course of three years. *Compare, e.g.*, AR at 337-39 (poor prognosis; noting severe depression, anxiety, panic, and stress), *with* AR 256-57 (similar, June–July 2003), *and* AR at 253 (similar, October 2003). While this evidence may be subject to scrutiny, to reject it out-of-hand as speculative is to make a conclusion unsupported by the record. Due to Dr. Fink's history of treating the plaintiff, and the express bases upon which he supported his September 2005 opinions, branding certain opinions as "speculation" is neither a specific nor a legitimate basis for rejecting those opinions.

The mere fact that such opinions are unaccompanied by contemporaneous reports for late 2004 to August 2005 does not cure this error, absent further explanation supported by substantial evidence. *See, e.g.*, *Smith v. Bowen*, 849 F.2d 1222, 1225 (9th Cir. 1988) ("It is obvious that medical reports are inevitably rendered retrospectively and should not be disregarded solely on that basis.") (citing *Bilby v. Schweiker*, 762 F.2d 716, 719 (9th Cir. 1985)); *cf.* SSR 83-20 ("Determining the proper onset date is particularly difficult, when, for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available. In such cases, it will be necessary to *infer* the onset date from the medical and other evidence that describe the history and symptomatology of the disease process. . . . [I]t may be possible, based on the medical evidence[,] to *reasonably infer* that the onset of a disabling impairment(s) occurred some time prior to the date of [a] recorded

medical examination.") (emphasis added).[7]

In sum, the ALJ did not give specific and legitimate reasons for discrediting Dr. Fink's September 29, 2005 opinions as of September 2005 and retrospective to August 2002. The ALJ's insufficient evaluation in this regard is only bolstered, not weakened, by Dr. Fink's July 2006 declaration and accompanying documents. On remand, the ALJ should give proper weight to Dr. Fink's September 2005 opinions, or provide specific and legitimate reasons, supported by substantial evidence in the record, for rejecting them. It is true that the ALJ did not have the benefit of Dr. Fink's July 2006 submission before issuing his April 2006 decision. He will, however, have ample opportunity to address it on remand. At that time, the ALJ will also have the opportunity to specifically readdress and clarify any allegedly conflicting findings by Dr. Fink, in light of the extended administrative record in this case.[8]

C. The ALJ Should Reevaluate the Plaintiff's Credibility on Remand

Because this case is being remanded for the reasons detailed above, the Court eschews a detailed analysis of the ALJ's credibility determination. In light of the fact that the Court has

---

[7] Fourth and finally, regarding the import of plaintiff's alleged daily activities, the ALJ is reminded that the fact that plaintiff can infrequently clean, drive six miles, attend church bi-weekly, bathe and dress every other or every third day, and infrequently garden, see AR at 386-89 does not mean she is capable of continuously and consistently performing in a structured work environment. *See* 20 C.F.R. § 404, Subpt. P., App. 2, § 200.00(c) (defining RFC as "the maximum degree to which the individual retains the capacity for *sustained* [work].") (emphasis added); *Lester*, 81 F.3d at 833 ("Occasional symptom-free periods are not inconsistent with disability."). Furthermore, "[t]he Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work environment." *Smolen*, 80 F.3d at 1284.

[8] Remand will also allow the ALJ to reassess his interpretation of several of Dr. Fink's treatment notes that have since been clarified by Dr. Fink's July 2006 declaration. These include the ALJ's interpretation of Dr. Fink's isolated references that plaintiff was "fairly stable" and "active" in August 2002 (AR at 22; *but see* AR at 374); the ALJ's interpretation of Dr. Fink's notation "=work" in his April 2003 notes (AR at 22, 258; *but see* AR at 372); and the ALJ's reference to Dr. Fink's isolated January 2003 statements of plaintiff "looking for work." AR at 22, 259; *but see* AR at 371.

found that the ALJ failed to properly evaluate the medical opinions of Dr. Fink, and because credibility determinations are linked to conclusions regarding medical evidence, 20 C.F.R. § 404.1529, the ALJ's credibility finding is also reversed and the issue remanded. After reevaluating the medical evidence of record, as expanded by the declaration and materials submitted to the Appeals Council, the ALJ will be in a better position to evaluate the plaintiff's credibility.

VIII. CONCLUSION

Because the ALJ erred by failing to provide legally sufficient reasons for rejecting the medical opinions of Dr. Fink, this case should be REVERSED and REMANDED for further proceedings not inconsistent with this Report and Recommendation. In particular, the ALJ should reevaluate the medical evidence regarding plaintiff's mental impairments (including all materials submitted to the Appeals Council), reassess and give proper weight to the opinions of Dr. Fink, reevaluate plaintiff's RFC, and reassess plaintiff's credibility. To the extent that the plaintiff's impairments and/or limitations are modified on remand, the ALJ should propound a new hypothetical to the VE that incorporates the erroneously rejected testimony and, if necessary, review the evidence of the onset of the mental impairments with the assistance of a medical expert pursuant to SSR 83-20. Finally, should the ALJ conclude that the plaintiff is disabled for a closed period, the ALJ should determine whether plaintiff's insured status should be tolled during such a period, and if so, whether he is entitled to DIB under Title II of the Social Security Act. *See* 20 C.F.R. § 404.110(c). A proposed order accompanies this Report and Recommendation.

DATED this 27th day of September, 2007.

James P. Donohue

JAMES P. DONOHUE
United States Magistrate Judge